IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| C.K., a minor child, by and through her parents and next friends A.K. and P.M, | * | |
| | * | |
| Plaintiffs, | * | Civil Action No. GLR-22-804 |
| v. | * | |
| BALTIMORE CITY BOARD OF COMMISSIONERS, et al., | * | |
| Defendants. | * | |
| | *** | |

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on Plaintiffs C.K., by and through her parents and next friends A.K. and P.M.'s ("the Parents"), Motion for Summary Judgment and Motion for Leave to File Surreply, (ECF Nos. 19, 33), and Defendants Baltimore City Public Schools ("BCPS") and Baltimore City Board of School Commissioners' (collectively, "the Board") Cross Motion for Summary Judgment and Motion to Dismiss, (ECF No. 24).[1] The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will deny the Parents'

---

[1] BCPS moves to dismiss "Baltimore City Public Schools" as a Defendant in this action because it is not a separate legal entity from the Board. (Mem. Supp. Defs.' Cross Mot. Summ. J. ["Cross Mot. Summ. J."] at 1, ECF No. 24-1). Because it appears that Baltimore City Public Schools is not a proper Defendant and Plaintiffs do not oppose its dismissal, the Court will direct the Clerk to terminate Baltimore City Public Schools as a Defendant in this action. For clarity purposes, however, the Court may still refer to actions taken by BCPS in this Memorandum Opinion with the understanding that the Board holds all potential liability for those actions.

Motion for Summary Judgment, deny the Parents' Motion for Leave to File Surreply, and grant the Board's Cross Motion for Summary Judgment.

## I.   BACKGROUND

A.   **Factual Background**

C.K. is a seventeen-year-old girl who suffers from anxiety, excoriation (skin-picking) disorder, attention deficit hyperactivity disorder ("ADHD"), and obsessive-compulsive disorder. (See Kennedy Krieger Institute Report ["KKI Report"] at 2, ECF No. 18).[2] To address these conditions, she sees a psychiatrist, Dr. Souraya Torbey, a psychologist, Dr. Angela Fadely, and her pediatrician, Dr. Paul Lipkin. (See Mar. 1, 2021 Tobey Letter at 1, ECF No. 18; Mar. 15, 2021 Fadely Letter at 1, ECF No. 18; Mar. 25, 2021 Lipkin Letter at 1, ECF No. 18).

Beginning in first grade, the Parents enrolled C.K. in the Baltimore Lab School ("BLS"), where she is currently in eleventh grade. (See BLS Personalized Education Plan ["BLS PEP"] at 1, ECF No. 18). BLS is private school that specializes in special education for students with learning disabilities. (See id.). BLS teachers provide small class sizes with an arts-enhanced curriculum, specialized reading support, and clinical related services including speech-language therapy, occupational therapy, and counseling. (See id.). Some students attending BLS are financially supported by local school systems, including BCPS, and others receive private or familial funding. (Hr'g Tr. at 751:1−9, ECF No. 18). In accordance with the law and school policy, BLS develops and implements Individual

---

[2] Each reference to ECF No. 18 refers to a document in the Administrative Record, which was filed in hard copy under seal in the Clerk's Office.

Education Plans ("IEPs") for publicly funded students and Personalized Education Plans ("PEPs") for privately funded students. (<u>See</u> <u>id.</u>). Because the Parents pay for tuition and all other school-related expenses, BLS created a PEP for C.K. which was approved by her Parents. (<u>See</u> <u>id.</u>).

The PEP begins by outlining C.K.'s learning abilities, based upon neuropsychological and educational evaluations from 2021. (BLS PEP at 2). It provides that C.K.'s speech and language skills are mostly low average, while her math skills are low, and her full-scale IQ score is low average at 80. (<u>Id.</u> at 3). The PEP contains learning goals to target C.K.'s weaknesses, such as improved accuracy in reading compression and math exercises. (<u>Id.</u> at 24). To support C.K., the PEP lists the following supports, among others: small classes, guiding questions, assistive technology, organizational aids, extended time, teacher modeling, frequent checks for understanding, a spell check device, a calculation device, integrated speech-language services, and frequent breaks. (<u>Id.</u> at 4−5, 13−14). Further, under Summary of Assessment Findings, the PEP says that C.K. "has made regular and consistent progress on her requisite goals, but the goals need to continue to be implemented to be fully achieved." (<u>Id.</u> at 9). Additionally, it states that C.K. "currently requires teacher structure and prompting to check in, which can fade as she becomes more independent in assessing her own progress." (<u>Id.</u>). As to C.K.'s social and emotional behavior, the PEP notes that she "is a social student and enjoys spending time with friends," although she sometimes struggles to ask for help or communicate her needs. (<u>Id.</u>). She is also inconsistent with punctuality and attention during class. (<u>Id.</u>). The Parents reported concerns about anxiety, but C.K. denied feeling elevated symptoms of anxiety in

her self-assessment and she has not had a panic attack since she was six years old. (Id. at 1, 4, 9).

In Fall 2020, when C.K. was in ninth grade, the Parents investigated whether a BCPS program could offer C.K. extra-curricular opportunities not available to her at BLS. (Hr'g Tr. at 925:4−17). They contacted the BCPS Child Find Office to begin the enrollment process. (See BCPS Child Find Referral, ECF No. 18). "Child Find" is the process through which children with disabilities are identified and evaluated. 20 U.S.C. § 1412(a)(3). The Child Find Office referred the Parents to the nearest BCPS School, Digital Harbor High School, to initiate the IEP process. (See Notice of IEP Team Meeting at 1, ECF No. 18).

On April 20, 2021, Digital Harbor held an initial meeting to determine whether C.K. was eligible for an IEP. (See id.). The Parents attended with their educational consultant, Lisa Frank. (ALJ Decision at 13, ECF No. 18).[3] The BCPS team determined that C.K. qualified for an IEP after reviewing a neuropsychological report from the Kennedy Krieger Institute ("KKI Report"), an education assessment by Frank, a speech and language evaluation from BLS, and a BLS progress report. (BCPS Evaluation Report at 2, ECF No. 18). At the end of the meeting, the BCPS team further stated that the IEP could be implemented at any Baltimore City school. (ALJ Decision at 27).

---

[3] Like the rest of the Administrative Record, the ALJ's Decision was filed in hard copy under seal. (See ECF 18). A redacted version of the Decision is publicly available on the Maryland Department of Education website. Md. Dept. of Ed., Due Process Hearing Decisions - FY22 - 3rd Quarter, https://marylandpublicschools.org/programs/Pages/SpecialEducation/FSDR/HearingDecisions/2022/FY22_3rdQtr.aspx (last visited Apr. 28, 2023).

On May 13, 2021, Digital Harbor held a second meeting for the purpose of developing the IEP. (BCPS Notice of IEP Team Meeting 2 at 1, ECF No. 18). Again, the Parents attended with Frank. (ALJ Decision at 14). Prior to this meeting, BCPS had sent a draft of the IEP to the Parents in accordance with Maryland law. (See BCPS Draft IEP ["IEP"], ECF No. 18). The IEP draft identified the "General Education Teacher" as the primary provider for all supplementary aids and services. (Id. at 17−18). This contrasted with the BLS PEP, which indicated that a Special Education Teacher would provide all instructional supports, program modifications, and social and behavioral supports. (BLS PEP at 17−19). Frank asked how the general education teacher was determined to be the primary provider of supplementary aids and services before the meeting to develop the IEP had been held or discussed with the Parents. (IEP at 42). Frank also questioned whether a placement had been predetermined. (See id.). The Chairperson of the IEP meeting, Amber Falcon, denied that the placement was predetermined and said that the IEP was still in draft form and could be changed. (See id.). Although the Parents later requested that the primary provider be changed to the special education teacher, BCPS refused. (See id.).

In drafting the IEP, the IEP team considered the BLS PEP, a BLS progress report, the KKI report, and the Woodcock-Johnson IV Test of Achievement ("WJ Test") administered by Frank. (Id. at 2). The Parents and the BCPS IEP team members agreed on most of the IEP's content. (See ALJ Decision at 14). They agreed that C.K. is capable of working on grade-level work, with accommodations, and that she was expected to graduate from high school on time. (See IEP at 30). The Parents and the BCPS IEP team members also agreed that the IEP is largely based on the PEP and that it accurately summarizes

C.K.'s learning disabilities and goals. (See ALJ Decision at 14). The IEP identifies the following learning and cognitive deficits for C.K.: verbal comprehension, working memory, reading, math, written language, speech and language skills generally, and social emotional skills. (IEP at 2). It further states that C.K., who was in ninth grade when the IEP was drafted, reads at a fifth-grade level, (id. at 6), writes at a sixth-grade level, (id.), and does math at a fifth-grade level, (id. at 7). The IEP includes an "impact statement" which states "[C.K.]'s multiple disabilities (Other Heath Impairment due to ADHD and anxiety and Specific Learning Disability) negatively impact her involvement with general education curriculum in the areas of reading, math, and written language." (Id. at 15). It further says that C.K.'s

> ADHD/Anxiety leads to distractibility or trying to finish work too quickly . . . . In all her classes, she has difficulty editing her work without direct teacher support and extended time. Due to her anxiety, [C.K.] does not ask the teacher for help when she doesn't understand. [C.K.]'s weakness in executive functioning . . . makes it difficult for her to independently evaluate work or self-advocate for help.

(Id.).

The Parents and the BCPS IEP team members disagreed, however, on how C.K.'s learning disabilities should be addressed. (See ALJ Decision at 34). The IEP notes that the Parents submitted a statement prior to the IEP meeting explaining their concerns about C.K.'s anxiety, including panic attacks and skin picking. (IEP at 14). They said that C.K. "is not able to learn in a large classroom environment, and would likely regress significantly . . . . For our daughter to learn and make progress she needs to be in small classes with minimal distractions." (Id.).

The BCPS IEP team members, on the other hand, proposed that C.K. spend over thirty hours per week in a general education setting with non-disabled peers, with five hours of special education support, including thirty minutes of speech-language therapy. (Id. at 42−43). General education classes at BCPS may have up to twenty-five students. (Hr'g Tr. at 1248:12−18). Further, while the IEP includes many supplementary aids and services that the BLS PEP provided, such as extra time, frequent breaks, organizational assistance, and repeated instructions, the BCPS-based IEP team members eliminated some supports against the Parents' wishes, including arts-enhanced curriculum, access to a word processor, and speech-language consulting services. (See ALJ Decision at 35). The BCPS IEP team members said that these did not need to be in the IEP because these supports were provided to all BCPS students. (See id. at 20−28). The Parents rejected the IEP and decided to re-enroll C.K. at BLS. (ALJ Decision at 8).

## B.  **Administrative Proceedings**

On August 25, 2021, the Parents filed a due process complaint with the Maryland Office of Administrative Hearings. (ALJ Decision at 1). They alleged that BCPS had failed to follow procedural requirements of the Individuals with Disabilities Education Act ("IDEA") and to develop an IEP reasonably calculated to provide C.K. with a free appropriate education ("FAPE"), and that BLS provided C.K. with an appropriate education. (See id. at 8). They sought funding from BCPS for tuition and school-related expenses, as well as attorneys' fees. (See id.).

An Administrative Law Judge ("ALJ") presided over a thirteen-day due process hearing beginning on November 29, 2021. (Id. at 2). The Parents testified and also

presented the following witnesses: (1) Paul Lipkin, C.K.'s pediatrician and an expert in pediatrics and neurodevelopmental disabilities, (2) Katherine Mulherin, school social work expert, (3) Jennifer Kelleher, special education expert, (4) Richard Allen, C.K.'s teacher, (5) Lisa Frank, the Parents' education consultant and an expert in special education, (6) Kelly Keesler, special education expert and C.K.'s teacher, and (7) Melissa Blackwell, neuropsychology expert. (Id. at 6). BCPS also presented witnesses: (1) Amber Falcon, IEP team member and special education expert, (2) Nicholas Essock, speech-language pathology expert and BCPS speech therapist, (3) Abigail Deal, special education expert, (4) Kerith Kiewra, school psychology expert, and (5) Catherine Kalafut, special education expert. (Id. at 7).

Both parties relied upon the KKI Report and the WJ Test administered by Frank. (Id. at 10). The KKI Report, dated November 27, 2020, showed that many of C.K.'s learning skills and her general abilities index were in the low average range, while a few skills such as working memory and verbal comprehension were below average. (KKI Report at 4, ECF No. 18). Her IQ Score of 80 placed her in the tenth percentile compared to her same-age peers. (Id.). The KKI Report also showed a few strengths, such as verbal fluency, in the high average range. (Id. at 5). The summary stated that C.K. "has many skills that are age-appropriate (low average to average) including overall intellectual functioning, aspects of attention and executive functioning, language, nonverbals skills, visual motor integration, fine motor speed and dexterity, memory, reading and math." (Id. at 6). It further said that "[i]ndividuals with low average intellectual functioning are typically slower to learn than peers . . . . While they make academic gains in school year

to year, their progress will occur at a slower rate compared to peers." (Id. at 7). The KKI Report recommended that given C.K.'s intellectual functioning, as well has her ADHD and her history of anxiety, she should "continue to receive supports at school and at home." (Id.). The WJ Test, dated January 26, 2021, showed similar results to the KKI Report. C.K. received low average scores in reading, a low score in math, and average scores in writing. (WJ Test at 2, ECF No. 18).

At the administrative hearing, the Parents and their experts emphasized C.K.'s learning differences and posited that she could not possibly be served by a placement in a general education setting that provided only five hours of special education per week. (ALJ Decision at 34). They argued that she required small class sizes, arts-enhanced curriculum, and full-time special education instruction. (Id.). BCPS's experts, on the other hand, argued that although C.K. has learning disabilities, she also has strengths that would allow her to receive educational benefit from learning alongside non-disabled peers. (See id. at 36).

On February 16, 2022, the ALJ issued a 44-page decision in which she found that BCPS had not committed procedural violations and that it had developed an appropriate IEP and offered C.K. a FAPE. (Id. at 44). Because she concluded that BCPS offered C.K. a FAPE, she did not address whether BLS was an appropriate placement. (Id.).

**C.     Procedural History**

On April 4, 2022, C.K. and the Parents filed their Complaint against BCPS and the Board alleging that the ALJ erred as a matter of fact and law in holding that BCPS did not commit procedural violations, had developed an appropriate IEP, and offered C.K. a FAPE. (Compl. ¶¶ 33−35, ECF No. 1). They request declaratory and injunctive relief reversing

the ALJ's decision and ordering BCPS to reimburse the costs of C.K.'s education at BLS for the 2021−2022 school year. (Id. ¶¶ 1−2).

On October 7, 2022, the Parents filed a Motion for Summary Judgment. (ECF No. 19). The Board filed a Cross Motion for Summary Judgment and Motion to Dismiss on November 14, 2022. (ECF No. 24). On December 12, 2022, the Parents filed an Opposition, (ECF No. 27), and the Board filed a Reply on January 23, 2023, (ECF No. 32). On January 26, 2023, the Parents filed a Motion for Leave to File Surreply.[4] (ECF No. 33). The Board filed an Opposition on February 8, 2023. (ECF No. 34). On April 25, 2023, the Court directed the parties to file supplemental briefing on whether there is factual support in the record for the Board's claim that "Digital and other comprehensive high schools in the school system serve students with profiles like that of C.K." (Apr. 25, 2023 Order at 1,

---

[4] Surreplies are generally not permitted, see Local Rule 105.2(a) (D.Md. 2021), although the Court may use its discretion to allow a party to file a surreply. EEOC v. Freeman, 961 F.Supp.2d 783, 801 (D.Md. 2013), aff'd in part, 778 F.3d 463 (4th Cir. 2015). This discretion is typically used in the interest of fairness to permit parties to respond to new matters raised for the first time in the opposing parties' reply briefs. See Khoury v. Meserve, 268 F.Supp.2d 600, 605 (D.Md. 2003), aff'd, 85 F.App'x 960 (4th Cir. 2004).

Here, the Parents do not allege that the Board raises new arguments in its Reply; rather, they allege that the Board made factual misstatements and that they need to "assuage any concerns the Court may have regarding Plaintiffs' counsels' ethics and candor." (Mot. Leave File Surreply at 3, ECF No. 33). The Court, in its discretion, declines to allow for a surreply in these circumstances. The Parents have already filed a Motion for Summary Judgment and an Opposition to the Board's Cross Motion, and the Court allowed the parties to exceed the usual page limitations. (See June 8, 2022 Order at 1, ECF No. 17). Further, the parties have already briefed their disagreements concerning the facts of this case, (see, e.g., Pls.' Mem. Opp'n Defs.' Cross Mot. Summ. J. ["Opp'n"] at 15, ECF No. 27), and there is a full Administrative Record from which the Court can draw its own conclusions. Finally, the Court has no concerns about the ethics and candor of the Parents' counsel. Accordingly, the Court will deny the Motion for Leave to File Surreply. (ECF No. 33).

ECF No. 35). The Board filed its Supplemental Briefing on May 2, 2023 (ECF No. 36) and the Parents filed their Response on May 5, 2023 (ECF No. 37).

## II.    DISCUSSION

## A.    <u>An Overview of the IDEA</u>

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); <u>see</u> <u>Fry v. Napoleon Cmty. Schs.</u>, 580 U.S. 154, 166 (2017). In exchange for receiving federal funds under the IDEA, States pledge to comply with certain statutory conditions. <u>See</u> 20 U.S.C. § 1414.

First, a school district must prepare and implement an appropriate IEP for each child determined to be learning disabled. 20 U.S.C. § 1414(d). The United States Supreme Court addressed the standard for determining whether a school has provided an appropriate IEP in <u>Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1</u>, 580 U.S. 386 (2017). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." <u>Id.</u> at 399. Creating an IEP is a "fact-intensive exercise" that is "informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." <u>Id.</u> "Any review of an IEP must appreciate that the question is whether the IEP is <u>reasonable</u>, not whether the court regards it as ideal." <u>Id.</u> "The IEP itself addresses the student's current educational status, annual educational goals, the need for special educational services or other aids necessary to help meet those goals, and whether the child

may be educated in regular school classroom with non-disabled students." <u>S.S. v. Bd. of Educ. of Harford Cnty.</u>, 498 F.Supp.3d 761, 768–70 (D.Md. 2020).

Additionally, a student's FAPE must provide a disabled child with meaningful access to the educational process. <u>Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 192 (1982) ("[I]n seeking to provide . . . access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful."). The Supreme Court in <u>Rowley</u> determined that a school provides a student with FAPE when the IEP provides access to an educational program that confers "some educational benefit" upon the student with a disability. <u>Id.</u> at 200. To determine whether this standard is met, courts follow a two-step inquiry. <u>Id.</u> at 206. First, the Court must determine whether the State or local educational authority complied with the procedures set forth in the Act. <u>Id.</u> Second, the Court must determine whether the IEP was reasonably calculated to enable the child to receive educational benefits. <u>Id.</u> at 207. "As the party challenging the administrative findings, the [p]laintiffs bear the burden of proof of establishing a violation of the IDEA." <u>S.S.</u>, 498 F.Supp.3d at 769.

In addition to providing "some education benefit," <u>Rowley</u>, 458 U.S. at 201, the IEP must place the child in the least restrictive environment ("LRE"), meaning that students with and without disabilities should be educated in the same classroom "to the maximum extent appropriate," 20 U.S.C. § 1412(a)(5)(A). In some cases, however, a general education environment may not be an appropriate placement for a child due to the nature or severity of her disability. 34 C.F.R. § 300.114(a)(2)(ii). In such a case, it is well-

established that a FAPE might require placement of the child in a private school with full funding by the public-school district. Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369 (1985). However, the school district is not required to pay for the student's tuition at private school if it has satisfied its obligation to provide a FAPE for the student. 34 C.F.R. § 300.148(c). Parents may recover the cost of private education only if a court finds both (1) the proposed IEP inadequate in its provision of a FAPE, and (2) the private education services obtained by the parents are appropriate to meet the child's needs. Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993).

**B.      Standard of Review**

In IDEA cases, the Court conducts "modified de novo review, giving due weight to the underlying administrative proceedings." M.L. by Leiman v. Smith, 867 F.3d 487, 493 (4th Cir. 2017). The Court's analysis necessarily involves a review of the administrative record. "Generally, in reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." Doyle v. Arlington Cnty. Sch. Bd., 953 F.2d 100, 103 (4th Cir. 1991).

In Doyle, the United States Court of Appeals for the Fourth Circuit carefully considered how to apply the "due weight" requirement. Id. at 104−05. The Fourth Circuit concluded that level of deference given to findings of fact depends on whether the administrative officer's findings were "regularly made." Id. at 105. A reviewing court "should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." Id. If the reviewing court finds that

13

the administrative authority has departed "far from the accepted fact-finding process," the fact-finding is not "regularly made." Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H., 642 F.3d 478, 485 (4th Cir. 2011). In other words, "[f]actual findings must be 'reasoned and supported by the record' to warrant deference.'" M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 241 (2d Cir. 2012) (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 114 (2d Cir. 2007)). When the reviewing court does find the fact-finding of the administrative officer to be regularly made, such findings are "entitled to be considered prima facie correct, akin to the traditional sense of permitting a result to be based on such fact-finds, but not requiring it." Doyle, 953 F.2d at 105 (citing N.Y. Transit Author. v. Beazer, 440 U.S. 568, 587 n.31 (1979)).

Indeed, this Court has previously expressed that plaintiffs in IDEA cases face an "uphill battle" for several reasons:

> (1) they carry the burden of proof in the administrative hearing and in the district court; (2) if the administrative findings were made in a regular manner and have evidentiary support, they are to be considered prima facie correct; (3) in according due weight to an ALJ's findings, the court owes deference to the ALJ's determinations of the credibility of witnesses; and (4) the court owes generous deference to educators.

S.A. v. Weast, 898 F.Supp.2d 869, 874 (D.Md. 2012).

Prima facie correctness does not mean that a district court must follow the administrative officer's findings and legal conclusions. See Springer v. Fairfax Cnty. Sch. Bd., 134 F.3d 659, 663 (4th Cir. 1998) (concluding that Doyle did not require that deference be given to an administrative opinion that was "both cursory and conclusory"). If a reviewing court disagrees with the administrative officer's findings and fails to adhere to

them, "it is obligated to say why." <u>M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.</u>, 303 F.3d 523, 531 (4th Cir. 2002). But "[a]fter giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by statute." <u>Doyle</u>, 953 F.2d at 105.

Additionally, even if the factual findings are found to be "regularly made," the district court must still make its own independent determination regarding the legal conclusions that have been drawn by the administrative officer. <u>Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH</u>, 642 F.3d 478, 485 (4th Cir. 2011). The district court may accept the administrative officer's factual findings but find that the evidence, considered as a whole, points to a different legal conclusion than that reached by the officer. <u>Id.</u>; <u>see also Gerstmyer v. Howard Cnty. Pub. Schs.</u>, 850 F.Supp. 361, 364 (D.Md. 1994) (accepting the facts as found by the administrative officer but finding such facts compelled a different legal conclusion). This is "entirely appropriate and consistent with the district court's obligation to make its own independent determination." <u>Heffernan</u>, 642 F.3d at 485.

**C.**    **<u>Analysis</u>**

    **1.**    **Deference to the ALJ's Decision**

As a preliminary matter, the Court must determine whether the ALJ's Decision was "regularly made" and therefore entitled to deference. <u>Doyle</u>, 953 F.2d at 105. The Parents argue that the ALJ departed from the standard fact-finding process by giving greater weight to BCPS's witnesses' testimony. (Mem. Supp. Pls.' Mot. Summ. J. ["Mot. Summ. J."] at 17, ECF No. 19-1). Specifically, the Parents contend that BCPS's witnesses did not know C.K. and lacked direct experience with her as a student, and therefore that crediting their

testimony over the Parents' witnesses, who had personal knowledge of C.K., "is far from the accepted norm of the fact-finding process." (Id. at 17−18). The Board counters that the ALJ's findings were regularly made and that the ALJ's credibility assessments are entitled to deference. (Cross Mot. Summ. J. at 15). At bottom, the Court agrees with the Board.

An ALJ's findings are regularly made if "they are reached through a process that is [within] the accepted norm of a fact-finding process." J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., 516 F.3d 254, 259 (4th Cir. 2008). Thus, the findings are regularly made if the ALJ "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." Id. The focus is process oriented—whether the presiding official resolved the factual disputes "in the normal way" that hearings are supposed to take place—rather than on "the manner in which the hearing officer expressed his view of the case." Id. at 260. Indeed, the Fourth Circuit has held that a reviewing court cannot "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility." Doyle, 953 F.2d at 104.

Moreover, while the district court must "explain its reasons for rejecting the findings of the hearing officer," the "IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments." S.A., 898 F.Supp.2d at 877. Thus, "a court should give deference even to a poorly explained administrative decision as long as the hearing officer used standard fact-finding methods." S.T. ex rel. S.J.P.T. v. Howard

Cnty. Pub. Sch. Sys., No. JFM-14-00701, 2015 WL 72233, at *2 (D.Md. Jan. 5, 2015),

aff'd sub nom. S.T. v. Howard Cnty. Pub. Sch. Sys., 627 F.App'x 255 (4th Cir. 2016).

Here, the ALJ considered the testimony offered by C.K.'s witnesses and she wrote

a well-reasoned Decision explaining why she found the Board's position more convincing.

First, she appropriately recognized that while ALJs may give deference to the judgment of

education professionals as to the appropriateness of a placement, "[t]o give deference only

to the decision of the School Board would render meaningless the entire process of

administrative review." (ALJ Decision at 31−32 (quoting Sch. Bd. of Prince William Cnty.

v. Malone, 762 F.2d 1210, 1217 (4th Cir. 1985))). She then noted that "[t]he Student's

Parents are very knowledgeable about all aspects of the Student's health and education,"

and she summarized their testimony. (Id. at 33). Regarding the Parent's experts, the ALJ

acknowledged that they "were all of the opinion that the Student required small class sizes,

arts-enhanced curriculum, and full-day special education instruction," (id. at 34), and she

went on to discuss their testimony in more detail, (see id. at 34, 37−38, 42).

Second, although ALJs are not required to provide detailed explanations of their

credibility assessments, S.A., 898 F.Supp.2d at 877, the ALJ identified the following

weaknesses in the Parents' experts' testimony: Lipkin had never observed C.K. in any

education setting, (ALJ Decision at 38); Frank only observed C.K. in one class at BLS and

had never observed her in a setting with more than five other students, (id.); Allen, C.K.'s

algebra teacher, was accepted only as a fact witness and not as an expert in special

education, (id. at 42); Keesler taught C.K. for only part of the school year in a virtual

environment, (id.); and, most importantly, the testimony regarding C.K.'s alleged need to

be in small, special education classes was speculative, (see id. at 43). The ALJ said:

> It is of note that none of the Parents' expert witnesses have ever taught at a BCPS high school, and therefore had no personal knowledge regarding the BCPS high school academic instruction and teaching methods. Instead, they opined that [C.K.] requires exactly what BLS has been providing for the past nine school years. However, even the BLS experts when questioned were unable to definitely state that [C.K.] requires exactly what the BLS provides, just that she was making appropriate progress at the BLS. They had never observed [C.K.] in a class setting with more than six to ten students and could not opine how she would perform in a larger class environment, only that [C.K.] performed well at BLS.

(Id.).

Considering the ALJ's analysis explained above, it is clear that the ALJ did not

decide this case by flipping a coin, throwing a dart, or by other otherwise abdicating her

responsibility to reach a well-reasoned conclusion supported by the record. See J.P., 516

F.3d at 259. Her reasoning demonstrates her process for assigning less weight to the

Parents' experts was within "the accepted norm of a fact-finding process," id., and

therefore entitled to deference. See M.C., 2014 WL 7404576, at *11; S.A., 898 F.Supp.2d

at 877−78 (finding that the ALJ's failure to mention the testimony of the parents' witnesses

did not render her findings irregularly made. On the contrary, by not addressing the

testimony, "the ALJ made an implicit credibility determination that is entitled to deference

by the Court"). Although the Parents may disagree with the ALJ's Decision, their

difference of opinion does not mean that the ALJ deviated from the standard fact-finding

process.

Further, none of the cases cited by the Parents support their argument that an ALJ's findings are not regularly made when she gives greater weight to witnesses who lack personal experience with the student. (See Mot. Summ. J. at 17−18). For example, the Parents cite D.B. v. Craven, 210 F.3d 360 (4th Cir. 2000), wherein the Fourth Circuit affirmed a state review officer's decision not to give weight to testimony from an expert who had not talked to the student's teachers, observed him in school, or reviewed work samples. However, the Fourth Circuit did not hold that ALJs must not give weight to such testimony, or that crediting witnesses like the doctor in D.B. constitutes a departure from the regular fact-finding process. The facts of each case are different and the ALJ, as the trier of fact, has the advantage of hearing live testimony and making credibility determinations. As the reviewing Court, this Court cannot reverse the ALJ's regularly-made credibility determinations, see Doyle, 953 F.2d at 104, and given the ALJ's careful analysis in this matter, there is no reason to conclude that her findings were not regularly made.[5] Accordingly, the Court will give those findings due weight and deference.

---

[5] The Court notes that in support of their Motion for Summary Judgment, the Parents provide three affidavits from special education attorneys with experience litigating IDEA cases. (ECF Nos. 19-3, 19-4, 19-5). These attorneys assert that the ALJ deviated far from the regular fact-finding process in failing to credit the parents' witnesses. (See id.; Mot. Summ. J. at 19). The Parents do not identify any authority in which a district court considered similar opinions in an IDEA case, but they instead argue that the affidavits should be considered as general information and authority, much like a citation to a law review article. (Opp'n Cross Mot. Summ. J. at 18). The Board urges the Court to disregard the affidavits because the experts did not testify at the Administrative Hearing and thus they should be excluded as impermissible additional evidence. (Cross Mot. Summ. J. at 36−37).

The Court agrees with the Board. The attorneys did not provide these opinions during the administrative proceedings, and thus consideration of new evidence at this late stage is unwarranted. The Court focuses its review of the ALJ's fact-finding process in the

### 2.      Procedural IDEA Requirements

The Parents argue that the ALJ erred as a matter of law in finding that the Board followed IDEA's procedures because (1) BCPS predetermined C.K.'s placement, (Mot. Summ. J. at 29); and (2) the IEP team failed to discuss or identify a specific placement in the May 13, 2021 IEP meeting, (id. at 36). The Court will address each argument in turn.

Procedural violations may amount to an IDEA violation if they "significantly impeded the parents' opportunity to participate in the decision[-]making process regarding the provision of a free appropriate public education to the parents' child." 20 U.S.C. § 1415(f)(3)(E)(ii)(II). Therefore, "ordinarily, procedural violations of the IDEA are subject to a harmlessness analysis." M.C.E. ex rel. T.Q.A. v. Bd. of Educ. of Frederick Cnty., No. RDB-09-3365, 2011 WL 2709196, at *8 (D.Md. July 11, 2011).

Regarding the Parents' predetermination argument, it is true that "a school board may not predetermine what school a student may be placed in before creating the student's Individualized Education Plain and engaging in a discussion over what schools are suitable under the student's IEP." Id. (citing Spielberg v. Henrico Cnty. Pub. Schs., 853 F.2d 256, 259 (4th Cir. 1988)). Thus, "a school board must come to the IEP table with an open mind," as doing otherwise would deny the parents "the opportunity for any meaningful input." Id. at *9 (quoting Hanson v. Smith, 212 F.Supp.2d 474, 485–86 (D.Md. 2002)). This is not, however, a requirement that the school board "come with a blank mind." Id. ("[A] school

---

administrative record itself, as is the custom in this district and the Fourth Circuit. (See Cnty. Sch. Bd. of Henrico Cnty. v. Z.P. ex rel. R.P., 399 F.3d 298, 307 (4th Cir. 2005) (examining the administrative record and evidence presented at the hearing to determine whether the ALJ's findings were regularly made).

board may come to an IEP team meeting with some idea of what placement may be best for a student."); <u>Nack v. Orange City Sch. Dist.</u>, 454 F.3d 604, 610 (6th Cir. 2006) ("Predetermination is not synonymous with preparation.")

Here, the Parents argue that BCPS predetermined C.K.'s placement because: (1) the IEP identified the general education teacher as the primary provider for supplementary aids, (Mot. Summ. J. at 29); and (2) a BCPS employee said that "the IEP could be implemented at any Baltimore City high school" at the initial eligibility meeting, (<u>id.</u> at 31).

The ALJ determined that none of these events constituted a violation of IDEA's procedural requirements. (<u>See</u> ALJ Decision at 27). The ALJ found that Falcon, the IEP Chair for Digital Harbor High School, gave credible testimony explaining that certain IEP documents require selections to be made from drop-down menus. (<u>Id.</u> at 27–28). Accordingly, the Board selected the general education teacher as the service provider because it is the default choice that can be changed at the IEP meeting if the IEP team determines that the student needs a more restrictive placement. (<u>Id.</u> at 28). In C.K.'s case, the IEP team decided that she did not need a more restrictive placement and that the general education teacher could provide the IEP's supplementary services. (<u>Id.</u>).

The Court gives deference to the ALJ's findings, and it concludes that the ALJ did not err in deciding that there were no procedural violations. The Parents, who bear the burden of proof, have failed to establish that the BCPS violated IDEA procedure or that these alleged violations caused denied C.K. a FAPE. Falcon gave credible testimony about the default settings of the IEP forms and drafts in the Administrative Hearing, (Hr'g Tr. at

1217:8−24), and thus it is clear that identifying the service provider as the general education teacher was not a procedural violation. Further, although the Court notes that although the ALJ did not provide an analysis of the alleged comment that the "IEP could be implemented at any Baltimore City high school," this comment alone does not establish a procedural violation by a preponderance of the evidence.

The Court now turns to the Parents' argument that the IEP team failed to discuss or identify a specific placement in the May 13, 2021 IEP meeting. (Mot. Summ. J. at 36). They assert that BCPS violated the IDEA because Digital Harbor was named the service school by default, not by the IEP team, and the Board merely informed the Parents about the School Choice program without identifying a particular school. (Id.). C.K.'s father then had the responsibility of finding an appropriate school for his daughter, which was difficult given the lack of communication from the schools he contacted. (Id.). The Board counters that the ALJ was correct in determining that there was no procedural violation, because the ALJ found that the BCSP IEP team members made it clear that the IEP could be implemented at any Baltimore City school, including Digital Harbor, but that the Parents needed to participate in the School Choice program, which they did not. (Cross Mot. Summ. J. at 34; ALJ Decision at 28−29). Although this is a closer question, the Court agrees with the Board again.

The IDEA provides that an IEP must state "the projected date for the beginning of the services and modifications . . . and the anticipated frequency, location, and duration of those services and modifications." 20 U.S.C. § 1414(d)(1)(A)(i)(VII) (emphasis added). In A.K. ex rel. J.K. v. Alexandria City Sch. Bd., the Fourth Circuit found that the school

district failed to offer a FAPE when the IEP suggested an unspecified private school as a placement. 484 F.3d 672, 681 (4th Cir. 2007). A.K.'s parents applied to five schools, two of which told the parents that they had an appropriate program for A.K. Id. at 676. A.K.'s mother toured both schools, consulted with placement experts, and determined that neither school met A.K.'s needs. Id. at 677. The Fourth Circuit explained that:

> With the IEP not identifying any particular school (because the IEP team had not discussed the issue), the parents were left to fend for themselves to determine whether any private day school in their area—including the five ACPS applied to—would be a satisfactory fit. This is not how the IDEA was designed to work . . . .
>
> We emphasize that we do not hold today that a school district could never offer a FAPE without identifying a particular location at which the special education services are expected to be provided. There is no reason for us to frame the issue so broadly. But, certainly in a case in which the parents express doubt concerning the existence of a particular school that can satisfactorily provide the level of services that the IEP describes, the IEP must identify such a school to offer a FAPE.

Id. at 681−82.

Here, the Parents argue that their case is analogous to A.K. because BCPS's suggestion of either Digital Harbor or the School Choice program failed to identify a placement and left the Parents to fend for themselves in determining an appropriate school for their daughter. (See Mot. Summ. J. at 40). C.K.'s father contacted the BCPS Office of Enrollment, which told him to contact schools directly, but when he called several schools, he was often directed back to the Office of Enrollment and none of the schools suggested that he visit. (Id.).

The ALJ distinguished this case from A.K. because the Parents did not visit or apply to any schools and "[t]he school-based IEP team at Digital Harbor High School made it clear that it believed that the IEP as drafted could be implemented at any BCPS high school." (ALJ Decision at 29). The Court agrees with the ALJ. Although the alleged disorganization at BCPS regarding enrollment is concerning, it is not the Court's place to interfere in school policy and administrative procedures. See A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 325 (4th Cir. 2004) ("[T]he court's role in reviewing the administrative proceeding concerning IDEA is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." (citation omitted)). The question before the Court is not whether the School Choice program is efficient and effective—it is whether BCPS followed proper IDEA procedure and offered C.K. a FAPE. The Court concludes that it did, because unlike in A.K., the Parents did not actually apply to any schools. More importantly, the BCPS IEP team members made it clear to the Parents that Baltimore City schools, including Digital Harbor, serve students like C.K. and are capable of implementing the IEP. (See Hr'g Tr. at 1372:18−79:23). Therefore, they identified "the existence of a particular school [or schools] that can satisfactorily provide the level of services that the IEP describes," which is all that A.K. requires. See A.K., 484 F.3d at 682.

Accordingly, the Court concludes that the ALJ did not err in deciding that BCPS committed no procedural IDEA violations.

### 3.   Substantive IDEA Requirements

Because the Court has determined that BCPS did not violate the IDEA's procedural requirements, it now turns to the statute's substantive requirements and whether the IEP was reasonably calculated to enable C.K. to receive educational benefits. See Rowley, 458 U.S. at 207. The parties agree on the IEP's goals and its description of C.K.'s learning disabilities as described above. (See Cross Mot. Summ. J. at 14; ALJ Decision at 28). The Parents argue that the IEP is nevertheless inappropriate and that the ALJ erred in finding that it complied with IDEA's substantive requirements. (Mot. Summ. J. at 22). The Parents specifically contend that the IEP omits key supplemental aids and does not provide special education in small classes outside of general education. (Id. at 22, 25−26). The Board counters that the IEP was reasonably calculated to enable C.K. to receive educational benefits because the missing supplemental aids are included in the BCPS curriculum and C.K.'s disabilities are not severe enough to warrant a restrictive placement outside of general education. (See Cross Mot. Summ. J. at 19). At bottom, the Court agrees with the Board.

As the Supreme Court held in Rowley, the IDEA requires only that school districts provide an "appropriate" IEP that confers "some educational benefit." 458 U.S. at 200. The IEP need not offer a "potential-maximizing education," id. at 197; rather, "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal," Endrew F., 580 U.S. at 399.

In addition to providing this "basic floor of opportunity," Rowley, 458 U.S. at 201, the IEP must place the child in the least restrictive environment ("LRE"), meaning that

students with and without disabilities should be educated in the same classroom "to the maximum extent appropriate," 20 U.S.C. § 1412(a)(5)(A). Thus, the IEP must be "appropriately ambitious" in light of the child's unique circumstances. Endrew F., 580 U.S. at 402. "When a child is fully integrated in the regular classroom, as the Act prefers," providing a FAPE means that the school "provid[es] a level of instruction reasonably calculated to permit advancement through the general curriculum." Id. For some students with severe disabilities, however, a general education environment may not be an appropriate placement. 34 C.F.R. § 300.114(a)(2)(ii).

First, the Parents argue that the IEP cannot be reasonably calculated to enable C.K. to receive educational benefits because it removes the following supplementary aids that the BLS PEP provided: arts enhanced curriculum, access to a word processor, and integrated speech-language services and consultations. (Mot. Summ. J. at 22). The ALJ found that while the Parents might prefer C.K. to have access to an arts enhanced curriculum, they did not provide evidence that she requires this service. (ALJ Decision at 35). Upon review of the administrative record, the Court agrees. Further, Falcon provided credible testimony that art is a part of the curriculum because BCPS teachers are trained to use various modalities and to provide alternative ways for students to demonstrate learning, including through art. (Cross. Mot. Summ. J. at 20; Hr'g Tr. at 1186:13−87:1, 1576:11−86:7).

Regarding the word processor, BCPS provides all students with laptops with word processor capabilities, (Hr'g Tr. at 1198:21−1200:21), so its omission from the IEP is of no moment. (See ALJ Decision at 35). Finally, as to the integrated speech-language

services, the Court notes that the ALJ found that "[i]t is overwhelming clear from a review of the Student's present levels of performance and the annual goals, that the Student's needs would be addressed by the BCPS IEP which provides for thirty minutes per week of direct speech-language service." (Id. at 36). At the Hearing, Essock, a speech therapist at BCPS, credibly testified that C.K.'s speech and language skills mostly fall into the average range that is expected for her age group. (Hr'g Tr. at 1401:6−06:21, 1414:4−20). Further, he testified that thirty minutes of speech-language services with a speech therapist would be sufficient to address C.K.'s speech and language goals. (Id. at 1436:11−37:20). He also testified that although the IEP does not provide for consultative services, BCPS students who receive direct speech-language services automatically receive consultive services on an as-needed basis. (See id. at 1483:14−84:10). Accordingly, the Court finds that the evidence on the record shows that the IEP does not violate IDEA because of the omission of these supplementary supports.

The Court now turns to the Parents' principal argument, which is that C.K.'s disabilities are so severe that a placement in general education with only five hours of special education per week could not possibly be reasonably calculated to confer educational benefit. (See Mot. Summ. J. at 21). The Parent's expert witnesses all testified that C.K. required small class sizes and full-day special education instruction. (See ALJ Decision at 34). Frank testified that if C.K. were in a general education classroom of twenty-five or more students, she would "shut down." (Hr'g Tr. at 578:21−79:2). The Parents also assert that C.K. does not have "average" cognitive skills, and that BCPS has

misinterpreted her evaluative testing scores, resulting in an inappropriate placement. (Opp'n Cross Mot. Summ. J. at 17).

The Parents' argument fails for the same reasons that the ALJ did not err in crediting BCPS's witnesses over the Parents' experts: the Parents bore the burden of proof, but they provided only speculative evidence to support their position. While the Parents clearly believe that C.K. needs small classes, full-time special education, arts-enhanced curriculum, and other educational supplements, they did not provide evidence that C.K. will not receive "some educational benefit" from the IEP and placement proposed by BCPS. See Rowley, 458 U.S. at 200. In other words, they assert that C.K. must continue to receive the kind of education she has received since first grade and that she would fail in a different environment, but without evidence of C.K.'s failure to learn in larger classes with non-disabled peers, they cannot and did not demonstrate that the IEP denied her a FAPE. Further, although the parties disagree as to whether C.K.'s cognitive skills qualify as average, the ALJ based her decision not only on witness testimony, but on the KKI Report and the WJ Test that both parties relied upon. (See ALJ Decision at 34). While these materials identify C.K.'s weaknesses in working memory, math, reading, and attention, they also show that her general intellectual abilities are in the low average range compared to her same age peers. (See KKI Report at 4; WJ Test at 2). Accordingly, it was not unreasonable for the IEP team to offer C.K. a placement where she would spend over thirty hours a week in general education with supplementary supports and five hours of special education.

In sum, after considering the education evaluations, the speculative nature of the Parents' experts' testimony, and the complete administrative record, with deference to the ALJ's factual determinations, the Court concludes that the ALJ did not err in finding that the BCPS IEP offered C.K. a FAPE. While the IEP may not be designed to maximize C.K.'s learning potential and offer the best possible education, the IEP offers "some educational benefit" to C.K., which is all the IDEA requires. See Rowley, 458 U.S. at 197 (holding that the IEP need not offer a "potential-maximizing education"). As the Court finds that the IEP offered a FAPE, it need not consider whether BLS was an appropriate placement.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant the Board's Cross Motion for Summary Judgment (ECF No. 24), deny the Parents' Motion for Summary Judgment (ECF No. 19), and deny the Parents' Motion for Leave to File Surreply (ECF No. 33). A separate Order follows.

Entered this 31st day of May, 2023.


                    /s/

George L. Russell, III
United States District Judge